RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0072p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

BILLY LEMASTER and AMANDA LEMASTER dba
Lemaster Towing and Recovery,
          *Plaintiffs-Appellants*,

          *v.*

LAWRENCE COUNTY, KENTUCKY; PHILLIP L. CARTER,
Lawrence County Judge Executive, in his individual
and official capacities,
          *Defendants-Appellees*.

⎤
⎟
⎟
⎟
⎬  No. 22-5135
⎟
⎟
⎟
⎦

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Ashland.
No. 0:20-cv-00012—David L. Bunning, District Judge.

Argued:  October 27, 2022

Decided and Filed:  April 11, 2023

Before:  McKEAGUE, WHITE, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Laura Jane Phelps, WILHOIT LAW OFFICE, Grayson, Kentucky, for Appellants.
Jeffrey C. Mando, ADAMS LAW, PLLC, Covington, Kentucky, for Appellees.  **ON BRIEF:**
Laura Jane Phelps, William H. Wilhoit, WILHOIT LAW OFFICE, Grayson, Kentucky, for
Appellants.  Jeffrey C. Mando, Olivia F. Amlung, ADAMS LAW, PLLC, Covington, Kentucky,
for Appellees.

---

**OPINION**

---

MURPHY, Circuit Judge.   Billy and Amanda Lemaster run a towing business in Lawrence County, Kentucky.   The County placed their business on its "rotation list" of companies to call when it needed to order a tow.   Soon after Phillip Carter began managing the County, Billy Lemaster criticized his decision to fire an employee.   According to the Lemasters, this criticism led Carter to orchestrate their removal from the County's rotation list in violation of the First Amendment.   But the district court held that the Lemasters did not produce enough evidence to get a jury trial over whether Lemaster's criticism motivated Carter's actions.   We disagree and clarify the relevant causation rules in the process.   Yet we agree with the district court's other conclusion that the Lemasters could not hold the County liable for Carter's actions because they did not tie the actions to any county policy.   We thus reverse the court's grant of summary judgment to Carter but affirm its grant of summary judgment to Lawrence County.

I

At this stage of the Lemasters' suit, we must recite the facts in the light most favorable to them—whether or not they could convince a jury to believe their allegations.   *See Gambrel v. Knox County*, 25 F.4th 391, 400, 404 (6th Cir. 2022).

The Lemasters live in Lawrence County, a rural Kentucky county bordering West Virginia.   In 2018, they operated a small towing business, Lemaster Towing & Recovery.   Billy (whom we will call Lemaster from here on) also served as the fire chief of the all-volunteer Cherryville Fire Department.   Amanda, his wife, served as its treasurer.

Both in his role as fire chief and in his towing business, Lemaster sparred with Lawrence County's incumbent "judge executive," the elected head of its executive branch.   As fire chief, Lemaster believed that the fire department's crumbling building needed substantial repairs.   But the judge executive would not commit to help.

As a tow-business operator, Lemaster disagreed with the County's management of its "rotation list." The County's E-911 Center had several companies on a list to call when the center needed to order a tow (say, because of an accident). Under the County's official policy, dispatchers needed to rotate through the companies on the list so that the companies received an equal share of the work. If the company at the top did not respond, dispatchers would notify the next company on the list until they reached one that could report to the scene. The Lemasters managed to get Lemaster Towing on this list, and Lemaster estimated that their business earned 90% of its income from these calls. But Lemaster believed that the E-911 Center had not been "properly" rotating between companies. Lemaster Dep., R.41-1, PageID 232.

The judge executive was up for reelection in 2018. Phillip Carter, who had served in that role before, decided to run against the incumbent. Leading up to the election, Lemaster supported Carter by putting up yard signs and persuading citizens to vote for him. According to Lemaster, he did so because Carter promised to fix the rotation list and help repair the fire-department building.

Carter won the election and took office in January 2019. He quickly fired the County's emergency management assistance (EMA) director. This decision hurt Carter's relationship with Lemaster. Lemaster believed that Carter had fired the EMA director because of Carter's ongoing feud with the director's father. In April, Lemaster wrote a Facebook post criticizing the decision and calling for the County to reinstate the director.

Although this Facebook post did not mention Carter by name, it did not sit well with him. The next day, Carter called Lemaster "cursing" about the post. *Id.*, PageID 246. Lemaster began to record the call and threatened to post it on Facebook too. They discussed two things. Carter complained about Lemaster's post. He reiterated that he had been the judge executive for just three months. He added: "don't be putting that stuff on there and giving me a black eye, because it reflects on me." Tr., R.41-2, PageID 297. Lemaster agreed to take the post down. Yet he complained that the rotation list still had not improved. Carter admitted that he had forgotten about the issue and promised to "go in the morning and tell 911 to make sure that they rotate everybody." *Id.*, PageID 299. After this conversation, Lemaster deleted his post.

Carter then appeared to fix the rotation list. According to Lemaster, his business received a "steady volume" of calls from the E-911 Center over the next few months. Lemaster Dep., R.41-1, PageID 248. Lemaster estimated that his company went from receiving no more than one call per month up to receiving six per month.

But Carter soon took other actions against Lemaster. By June, Carter began to disparage the Lemasters' management of the Cherryville Fire Department. The Lemasters had spent public funds repairing a truck that they called the "dozer." *Id.*, PageID 250. Carter did not think that the department owned a bulldozer. So he reported the Lemasters to the state fire commission, accusing them of fraud. After an audit, the fire commission told Lemaster that it did not "find anything" concerning. *Id.*, PageID 255, 269.

Around the same time, Wilma McKenzie, a county resident who had once worked at the fire department, started to spread gossip about the Lemasters. Lemaster believed that McKenzie was doing Carter's "dirty work" by telling everyone in their community that Lemaster was stealing from the fire department and had been indicted. *Id.*, PageID 249. Lemaster also believed that McKenzie was circulating a "petition" to "remove [him] as fire chief and to build a new fire department[.]" *Id.* McKenzie later told Lemaster's friend over the phone that she had been circulating a petition "for Phil Carter" to "get signers to build a new fire department." Tr., R.41-11, PageID 334, 337.

Concluding that Carter was conspiring with McKenzie to incite the community against him, Lemaster again took to Facebook. On August 29, 2019, he posted: "Is Phillip L. Carter and Wilma Mckezie [sic] a couple now? Asking for a friend[.]" Post, R.42-2, PageID 572. According to Lemaster, he meant to humorously imply that the pair were "politically," not "romantically," involved. Lemaster Dep., R.41-1, PageID 260.

Five days later, the E-911 Center sent a terse email to dispatchers. The email's subject identified Lemaster Towing and the Cherryville Fire Department. Its body stated in all caps: "Per Judge Carter do not tone them out on any fire calls[;] use nearest department[;] . . . Lemaster Towing is no longer on the rotation list[.]" Email, R.19-5, PageID 96.

Lemaster learned that Carter had told dispatchers not to call his fire department and had removed Lemaster Towing from the rotation list. On September 7, he confronted Carter over the phone. During their conversation, Carter complained about the Cherryville Fire Department's failure to respond to emergency calls. But Carter denied telling the E-911 Center to ignore the department or to take Lemaster Towing off the rotation list. Carter alleged that the center must have misunderstood his instructions and promised to clear things up.

The same day, the center emailed the dispatchers again. The email explained that, at the direction of Carter, dispatchers should call the Cherryville Fire Department first and rely on other fire districts only if it did not respond. Yet the email said nothing about reinstating Lemaster to the rotation list. The E-911 Center's calls to Lemaster Towing thus "dropped off tremendously." Lemaster Dep., R.41-1, PageID 256.

The Lemasters sued Carter and Lawrence County under 42 U.S.C. § 1983 and state law. They alleged that Carter violated the First Amendment by removing Lemaster Towing from the rotation list in retaliation for Lemaster's criticisms. They sought to hold the County liable for Carter's unconstitutional conduct under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The Lemasters also raised, among other state-law causes of action, a claim for tortious interference with economic relations against Carter.

The district court granted summary judgment to Carter and the County on the free-speech and *Monell* claims. *See Lemaster v. Lawrence County*, 2022 WL 257067, at *4–11 (E.D. Ky. Jan. 26, 2022). It declined to exercise supplemental jurisdiction over the tortious-interference claim. *Id.* at *11. We review the court's decision de novo. *See Gambrel*, 25 F.4th at 399.

II

The Lemasters' First Amendment claim against Carter under 42 U.S.C. § 1983 requires them to prove: (1) that Lemaster engaged in speech protected by the First Amendment; (2) that Carter took an adverse action against him; and (3) that a causal connection exists between the speech and action. *See DeCrane v. Eckart*, 12 F.4th 586, 593 (6th Cir. 2021); *Anders v. Cuevas*, 984 F.3d 1166, 1175 (6th Cir. 2021). As their "protected speech," the Lemasters rely on two of Lemaster's Facebook posts: his post from April 2019 criticizing the County for firing an

employee and his post from August 2019 asking if Carter and McKenzie were a couple. As their "adverse action," they allege that Carter took business away from Lemaster Towing. They lastly assert that plenty of evidence connects Carter's decision to injure their business to the Facebook posts.

*Adverse Action*. We start with the easiest element at this stage: Could a reasonable jury find that Carter took an "adverse action" against the Lemasters? *DeCrane*, 12 F.4th at 593. The First Amendment protects against only those retaliatory actions that might silence an ordinary person. *See Rudd v. City of Norton Shores*, 977 F.3d 503, 514 (6th Cir. 2020). Under this test, we have long held that the removal of a tow company from a public "tow call list" would likely deter the ordinary company from speaking in order to avoid losing this government-generated business. *Lucas v. Monroe County*, 203 F.3d 964, 974 (6th Cir. 2000); *see Anders*, 984 F.3d at 1176–77; *cf. O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 715–16, 720 (1996).

This element thus turns on whether the Lemasters introduced enough evidence that Carter effectively, if not formally, removed their business from the E-911 Center's rotation list. They did so. Among other evidence, an employee at the E-911 Center sent an all-caps email to dispatchers stating that, "per Judge Carter," "Lemaster Towing is no longer on the rotation list." Email, R.19-5, PageID 96. And the calls that Lemaster Towing received from the center "dropped off tremendously" from then on. Lemaster Dep., R.41-1, PageID 256.

Carter objects that he never removed Lemaster Towing from the rotation list and that the employee who sent this email "misunderstood" his directions. Carter Dep., R.42-1, PageID 443–44. Carter allegedly intended for the email to convey only that the dispatchers should call another fire department if the Cherryville Fire Department did not respond. He did not mean for the email to remove the Lemasters' business from the rotation list.

Yet a rational jury could disbelieve this "misunderstanding" defense. For instance, Carter asserts that he tried to fix the problem by instructing an employee to send a clarifying email. But this follow-up email referred only to the fire department. The email did not mention Lemaster Towing, let alone restore it to the rotation list. Other parties have also contradicted Carter's claim. Barbara Howard, a dispatcher, testified that Carter "personally" told her not to call the

Lemasters. Howard Dep., R.43-1, PageID 588–90. She gave a concrete example from May 2020. After working her way through the rotation list without finding a tow, she announced over the radio that she did not have a tow company available. Hearing this statement, an incredulous Lemaster called Howard asking why she had not tried to call him. Howard responded: "Sir you're gonna have to talk to the judge about that." Tr., R.41-12, PageID 346. Howard's supervisor likewise recalled hearing from dispatchers that Carter had "told" them not to call Lemaster Towing. Ellis Dep., R.57, PageID 793. For purposes of appeal, then, even Carter concedes that his communications with dispatch employees could constitute an adverse action. Appellees' Br. 15 n.2.

*Protected Speech*. The next element presents a harder question (at least in part): Did the First Amendment protect Lemaster's speech? *See DeCrane*, 12 F.4th at 593. The First Amendment applies differently to a claim that the government has denied a party a benefit due to the party's speech as compared to a claim that the government has criminally punished the party for this speech. *See Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 675–76 (1996). Plaintiffs who allege that their speech has deprived them of a benefit (like the placement on a tow rotation list) must show that the speech addressed "a matter of public concern." *Lucas*, 203 F.3d at 973 (citation omitted). And their interest in speaking must outweigh the government's interest in limiting their speech under the "balancing test" from *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). *Umbehr*, 518 U.S. at 678.

Applying this test, Carter does not dispute that the First Amendment protected Lemaster's April 2019 Facebook post. *See Lemaster*, 2022 WL 257067, at *5; Appellees' Br. 15. Speech addresses a matter of public concern if it relates to a "matter of political, social, or other concern to the community." *Marquardt v. Carlton*, 971 F.3d 546, 549 (6th Cir. 2020) (citation omitted). And speech that criticizes an elected official's operation of the government relates to a matter of political and social concern. *See Anders*, 984 F.3d at 1176; *Lucas*, 203 F.3d at 973–74. Indeed, criticism of public officials falls at the First Amendment's core. *See Rudd*, 977 F.3d at 513–14. Lemaster's post engaged in this type of speech because he criticized

Carter's decision to terminate the County's EMA director.  Carter also does not even try to suggest that he had any valid reason to restrict this speech under *Pickering*'s balancing test.

At the same time, the Lemasters disagree with Carter (and the district court) over whether the First Amendment protected Lemaster's August 2019 Facebook post asking whether Carter and McKenzie were a "couple."  Post, R.42-2, PageID 572.  Whether the First Amendment protects this rhetorical question raises a tougher issue.  On the one hand, the district court took the post merely to pry into Carter's and McKenzie's "personal lives," not into government operations. *Lemaster*, 2022 WL 257067, at *5.  On the other hand, we must consider the post in "context" and against the "whole record."  *Marquardt*, 971 F.3d at 549 (citation omitted). Lemaster meant to convey that the pair had a "political[]" connection and that Carter had been using McKenzie as a private-citizen front to conceal government-engineered criticism.  Lemaster Dep., R.41-1, PageID 249, 260.  The small community in which Carter and Lemaster lived also may well have known of their disagreements and understood Lemaster's innuendo.

But we need not resolve this difficult question.  The Lemasters ask us to address it "only" if we reject their factual allegation that Lemaster's earlier post in April caused Carter to remove Lemaster Towing from the rotation list.  Reply Br. 1.  As explained below, a jury must resolve that causation issue.  And Carter testified that he had not even seen the later August post until his deposition in this lawsuit.  Carter Dep., R.42-1, PageID 495.  He thus could not claim at trial that he harmed the Lemasters' towing business because of this second post rather than the first one. Our choice to avoid this question thus should not cause any undue trial complications.

*Causal Connection*.  That resolution leads us to the final element: Could a reasonable jury find an adequate "causal connection" between Lemaster's Facebook post in April and Carter's removal of Lemaster Towing from the rotation list in September?  *DeCrane*, 12 F.4th at 593.  Because the district court highlighted confusion in our caselaw on the governing causation rules, we take this opportunity to clarify things. *See Lemaster*, 2022 WL 257067, at *8; *see also Spithaler v. Smith*, 803 F. App'x 826, 829–30 (6th Cir. 2020).  For a First Amendment plaintiff to recover under § 1983, protected speech "must be a 'but-for' cause" of a harmful action. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).  This test is met if a plaintiff would not have suffered the harm "but for" the speech. *Id.*

It is not met if the plaintiff would have suffered the harm even if the plaintiff had stayed silent. *See id.*; *see also Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1017 (2020).

When public employees or contractors allege that the government has retaliated against them because of their speech, the Court has implemented the required but-for test using a burden-shifting approach. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87 (1977); *see also Umbehr*, 518 U.S. at 675–78. A plaintiff must first show that "speech was 'a substantial or motivating factor' of" a harmful action. *Anders*, 984 F.3d at 1177 (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010)). Some statements in our cases have (wrongly) equated this motivating-factor test with but-for causation. *See Spithaler*, 803 F. App'x at 829. But this test does not require a but-for relationship. *See Comcast*, 140 S. Ct. at 1017; *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348–49 (2013). After all, speech sometimes may motivate a defendant's harmful action even if the defendant would have taken the same action for another reason without the speech. *See Hartman*, 547 U.S. at 260.

If the plaintiff meets this lower causation standard, the burden shifts to the government defendants. *See Nieves*, 139 S. Ct. at 1722. They can avoid liability by proving that they would have taken the same action even if the plaintiff had not spoken. *See Mt. Healthy*, 429 U.S. at 287. In other words, they must prove the *absence* of but-for causation. *See Massey v. Johnson*, 457 F.3d 711, 717 & n.2 (7th Cir. 2006); *Wagner v. Wheeler*, 13 F.3d 86, 90 (4th Cir. 1993).

The Court's burden-shifting approach adds complexity to our usual summary-judgment rules. When a defendant moves for summary judgment on an issue, the standard that the defendant must meet depends on who will bear the burden of proof at trial. *See Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020). If the plaintiff will bear this burden, the defendant's summary-judgment briefing need only show that the record lacks evidence from which "a rational trier of fact" could find for the plaintiff on the issue. *See Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (citation omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Since a free-speech plaintiff must prove the motivating-factor test, *see Mt. Healthy*, 429 U.S. at 287, this standard applies to the defendant's claim that speech did not even motivate a harmful action.

If, by contrast, the defendant will bear the burden of proof (as when it seeks summary judgment on an affirmative defense), "its burden of production is greater" at the summary-judgment stage. 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2727.1, at 492 (4th ed. 2016). The defendant must affirmatively introduce evidence of such weight that no rational jury could disagree with it. *See Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012); *see also Leone v. Owsley*, 810 F.3d 1149, 1153–54 (10th Cir. 2015) (citing cases). Since a free-speech defendant must prove the lack of but-for causation, *see Mt. Healthy*, 429 U.S. at 287, this standard applies to any claim that it would have taken the same harmful action even if the plaintiff had not spoken, *see Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056–57 (6th Cir. 2001).

This burden-shifting approach requires us to consider the nature of Carter's summary-judgment argument. Does he assert that Lemaster's Facebook post did not even motivate any decision to remove Lemaster Towing from the rotation list (a question on which Lemaster bears the burden of proof)? Or does he assert that he would have removed Lemaster Towing anyway for another reason (a question on which he bears the burden of proof)? Carter seeks to show that Lemaster's April Facebook post did not even partially motivate his decision to remove Lemaster Towing from the rotation list. We thus must consider whether the record would allow "a rational trier of fact" to find the contrary. *Viet*, 951 F.3d at 823 (citation omitted).

To answer this causation question in the free-speech context, our cases typically start by looking at the time gap between the protected speech and the harmful action. *See, e.g.*, *Anders*, 984 F.3d at 1177; *Vereecke*, 609 F.3d at 400. As a common-sense matter, the more time that passes between the two, the more evidence that a plaintiff must offer to show that the speech motivated the action. *See Vereecke*, 609 F.3d at 400. And vice versa. *See id.* at 401. So a total "lack of temporal proximity alone can" doom a claim that a plaintiff's speech motivated a defendant's act unless the plaintiff uncovers smoking-gun evidence of this motivation. *Anders*, 984 F.3d at 1177 (citation omitted). At the other extreme, if the act occurs within "days or weeks" of the speech, the close proximity can sometimes (if rarely) permit an inference that the one motivated the other. *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020); *cf. Sensabaugh v. Halliburton*, 937 F.3d 621, 630 (6th Cir. 2019); *Vereecke*, 609 F.3d at 401.

In most cases, though, a plaintiff will show some moderate time gap—say, a matter of months. *See Anders*, 984 F.3d at 1177–78; *Benison v. Ross*, 765 F.3d 649, 661–63 (6th Cir. 2014). Our summary-judgment inquiry then asks whether the plaintiff has offered enough "other evidence of retaliatory conduct" apart from this temporal proximity. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *see also, e.g.*, *Bluegrass Dutch Tr. Morehead, LLC v. Rowan Cnty. Fiscal Ct.*, 734 F. App'x 322, 329 (6th Cir. 2018).

Here, about four and a half months separate Lemaster's Facebook post and Carter's order to remove Lemaster Towing from the rotation list. This time difference does not permit Lemaster to rely on temporal proximity alone. *Cf. Sensabaugh*, 937 F.3d at 629–30. But the difference is not so large that it presumptively forecloses the Lemasters' claim. *Cf. Benison*, 765 F.3d at 661. Indeed, in another case involving a tow company, we held that a four-month gap could show that the company's speech motivated its removal from a "towing list" if the company unearthed other evidence of a retaliatory motive in discovery. *See Anders*, 984 F.3d at 1177–78.

The Lemasters have unearthed this evidence. To begin with, they have shown that Carter was upset by Lemaster's speech. On the day after Lemaster criticized Lawrence County for firing its EMA director, Carter called Lemaster up "cursing [him]" about this criticism and generally "being disrespectful[.]" Lemaster Dep., R.41-1, PageID 246. Far from "affirm[ing]" Lemaster's right to criticize the government, *Sensabaugh*, 937 F.3d at 630, Carter all but asked Lemaster to stay quiet because his criticism made Carter "look bad," Tr., R.41-2, PageID 301.

And while Carter appeared to fix the problems with the rotation list after Lemaster agreed to delete his post, the Lemasters offered evidence that Carter engaged in a "pattern of retaliatory mistreatment" from then on. *Benison*, 765 F.3d at 662. For one thing, a reasonable jury could find that Carter falsely accused the Lemasters of misconduct, forcing them to sit through a pointless audit over lawful expenses on a fire department truck. According to Lemaster, the state fire commission did not uncover any problematic activity. (Although Carter says that the commission recommended that the state police handle the matter, the jury must resolve this factual dispute.)

For another thing, a reasonable jury also could find that Carter convinced McKenzie to spread gossip about the Lemasters to try to force them out of the fire department. At Carter's doing, McKenzie falsely said that the Lemasters had been stealing from the fire department and that Lemaster had been charged with crimes. Even if this conduct does not itself qualify as an "adverse" action under the First Amendment, it bolsters the Lemasters' claim that the April criticisms of Carter had turned him against them. *Benison*, 765 F.3d at 661–62; *see Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208–09 (6th Cir. 2010).

The way that Carter removed Lemaster Towing from the rotation list also could lead a jury to find that he did so for an improper reason. According to the director of the E-911 Center, a county board must decide whether to add or remove a tow company from the rotation list. Ellis Dep., R.57, PageID 794. But Carter did not ask the board to remove Lemaster Towing. *Id.*, PageID 794, 796. Nor did he publicly announce that he had done so himself. Instead, he instructed the E-911 Center to send an internal email stating—without explanation—that the County had removed Lemaster Towing from the list. Email, R.19-5, PageID 96. And Carter did not correct this notice even after it became public and Lemaster confronted him about it. Most telling, Carter continued to privately tell dispatchers like Barbara Howard that they should not call Lemaster Towing—again, without explanation—even after the E-911 Center director contradicted him and instructed dispatchers to "call [Lemaster]." Howard Dep., R.43-1, PageID 589–92. As Howard noted, the director "would say, call him; the judge would say don't." *Id.*, PageID 591–92. Howard added that Carter was "upset" with Lemaster but did not give a "reason" why. *Id.*, PageID 589, 592.

Even during this litigation, moreover, Carter has not offered evidence of a valid reason why he would have told dispatchers to avoid Lemaster Towing. He has instead doubled down on his claim that he did not do so. Carter Dep., R.42-1, PageID 443–44; Appellees' Br. 5–6. But a fact dispute exists on that question. And his failure to introduce evidence of a neutral reason for his removal of Lemaster Towing provides further proof that he harbored an improper motive. Indeed, under the well-known test for resolving Title VII claims, employers must articulate a "legitimate, nondiscriminatory reason" precisely because the absence of such a reason often

permits an inference of invidious discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 509–11 (1993); *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253–56 (1981).

Carter offers two counterpoints. He first notes that the E-911 Center's calls to Lemaster Towing increased right after Lemaster's Facebook post. Appellees' Br. 18. Yet a jury could reasonably find that Carter remedied Lemaster's rotation-list concerns only because Lemaster agreed to delete the post (and stay silent) during their ensuing phone conversation. And it could find that Carter switched to retaliating against Lemaster in other ways, such as by raising false claims about his management of the fire department. As Lemaster opined, Carter "couldn't get me off rotation, so he was trying to find something else." Lemaster Dep., R.41-1, PageID 269.

Carter next suggests that this fire-department dispute (not Lemaster's Facebook post) could have led him to remove Lemaster Towing from the rotation list. Appellees' Br. 18–19. But Carter did not testify that the dispute undergirded his rotation-list decision. He only raises this speculation in briefing. And again, the Lemasters produced evidence that Carter's fire-department accusations "had no basis in fact." *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 879 (6th Cir. 2001). These accusations thus may instead represent additional retaliatory acts. Besides, the Lemasters needed to show only that Lemaster's Facebook post motivated Carter's actions; Carter bore the burden to prove that he would have taken the same actions anyway. *See Mt. Healthy*, 429 U.S. at 287. And he did not introduce the "powerful" evidence required to obtain summary judgment over whether this fire-department dispute would have led him to remove Lemaster Towing from the County's rotation list even without Lemaster's post. *Cockrel*, 270 F.3d at 1056 (citation omitted).

In short, this record would allow a rational jury to find that Lemaster's April Facebook post motivated Carter's decision to remove Lemaster Towing from the rotation list. Of course, a jury might well find that Carter did not intentionally harm Lemaster Towing. Even if it found that he did so, it might also find that the Facebook post did not motivate that decision or that Carter would have made it anyway for other reasons. But a jury must sort out all these factual issues.

III

Although the Lemasters have offered enough evidence to create a jury question over whether Carter violated the First Amendment, that fact alone does not suffice to seek damages from Lawrence County. The County may face liability under § 1983 only for its own actions, not for the actions of Carter on a respondeat superior theory. *See Monell*, 436 U.S. at 691. To make the County liable for Carter's conduct, they must show that this conduct arose from a county "'policy' or 'custom.'" *Gambrel*, 25 F.4th at 408 (citation omitted). Yet the district court held that the Lemasters could not tie Carter's "rogue" actions (unilaterally removing Lemaster Towing from the rotation list) to any such policy or custom. *Lemaster*, 2022 WL 257067, at *10.

The Lemasters argue on appeal that Carter's actions *automatically* qualified as the County's own policies given his high-level rank. They correctly note that a plaintiff may hold a municipality liable for an official's decision if the municipality has delegated "authority" to make the decision to that official. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *see Bible Believers v. Wayne County*, 805 F.3d 228, 260–61 (6th Cir. 2015) (en banc). But this route to establishing *Monell* liability requires proof that the employee exercised policymaking authority and that the employee's decision was "final and unreviewable" and so unconstrained "by the official policies of superior officials." *Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005) (quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)); *see Tlapanco v. Elges*, 969 F.3d 638, 658 (6th Cir. 2020).

And here, Carter lacked any final say over the rotation list. A county board instead had the "final authority" over whether to remove a tow company from the E-911 Center's rotation list. *Adair v. Charter County of Wayne*, 452 F.3d 482, 493 (6th Cir. 2006). So the choice to remove Lemaster Towing "was not the judge's decision to make." Ellis Dep., R.57, PageID 796.

The Lemasters respond that Howard, the dispatcher, testified that she does not "question" Carter's orders. Howard Dep., R.43-1, PageID 589. But this sole piece of evidence would not allow a reasonable jury to find that every instruction he gives represents the official (if informal) policy of Lawrence County. To the contrary, the director of the E-911 Center declared that Carter could not unilaterally remove tow companies from the rotation list. Ellis Dep., R.57,

PageID 794.  When he learned of Carter's actions, then, he told dispatchers that they must continue to call Lemaster Towing.  *Id.*, PageID 797–98.  The Lemasters thus did not present enough evidence that Carter lacked oversight from the board.  *See Miller*, 408 F.3d at 814.

\* \* \*

This conclusion leaves a final issue.  The Lemasters allege that they produced enough evidence for a reasonable jury to find in their favor on their state-law claim against Carter for tortious interference with economic relations.  But the district court did not even reach the merits of this claim.  Rather, the court dismissed the claim without prejudice, declining to exercise supplemental jurisdiction over it under 28 U.S.C. § 1367.  *See Lemaster*, 2022 WL 257067, at *11.  When we reverse a district court's dismissal of § 1983 claims, we typically also reverse the court's discretionary dismissal of any accompanying state-law claims.  *See Gambrel*, 25 F.4th at 412.  We see no reason to depart from our usual course here.

All told, we affirm in part and reverse in part.  We affirm the grant of summary judgment to Lawrence County on the Lemasters' *Monell* claim.  But we reverse the grant of summary judgment to Carter on their free-speech claim.  And we reverse the discretionary dismissal of their tortious-interference claim.  We remand for further proceedings consistent with this opinion.