NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0511n.06

No. 24-3947

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Nov 04, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| BRYAN PESTA, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLEVELAND STATE UNIVERSITY; | ) | ON APPEAL FROM THE |
| CLEVELAND STATE UNIVERSITY BOARD | ) | UNITED STATES DISTRICT |
| OF TRUSTEES, in their official capacities; | ) | COURT FOR THE NORTHEN |
| LAURA BLOOMBERG, in her individual and | ) | DISTRICT OF OHIO |
| official capacity; HARLAN M. SANDS, in his | ) | |
| individual capacity; BENJAMIN WARD, in his | ) | OPINION |
| individual capacity; CHRISTOPHER MALLETT, | ) | |
| in his individual capacity; CONOR MCLENNAN, | ) | |
| in his individual capacity; WENDY REGOECZI, | ) | |
| in her individual capacity, | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

Before: SUTTON, Chief Judge; GIBBONS and WHITE, Circuit Judges.

HELENE N. WHITE, Circuit Judge. Plaintiff-Appellant Bryan Pesta appeals the grant of summary judgment to the Cleveland State University ("CSU") Defendants-Appellees on his claims alleging that CSU investigated and fired him from his tenured position in violation of his First Amendment rights, after he co-authored a controversial paper. We **AFFIRM**.

## I. Facts

Pesta began working for CSU in 1998 as a visiting assistant professor. He earned tenure in 2010 and became a "Full Professor" in 2016. In August 2019, Pesta, together with Jordan Lasker, John Fuerst, and Emil Kirkegaard, published *Global Ancestry and Cognitive Ability* (hereinafter "*Global Ancestry*"). In *Global Ancestry*, Pesta and his co-authors purported to have

found support for a difference in cognitive ability between African-Americans and European-Americans and "genetics as a potential partial explanation for group mean differences in intelligence." R. 18, PageID 331, 353.

The prospect of authoring a paper like *Global Ancestry* arose around March 2018, when Pesta met with Fuerst in person for the first time. Pesta testified that the two discussed a research project about race and intelligence quotient ("IQ") scores, as well as how to acquire the data needed for that project. In particular, Pesta and his co-authors sought data from the National Institutes of Health ("NIH") derived from the Trajectories of Complex Phenotypes ("TCP") study, which catalogued the cognitive and mental-health development of around 10,000 Philadelphia-area adolescents. The TCP dataset is available through the NIH's Database of Genotypes and Phenotypes ("dbGaP"), parts of which the NIH subjects to restricted access (referred to as "controlled-access data"). The NIH restricts access to protect and respect study participants, in part because permitting misleading or degrading use of sensitive data would undermine the public's willingness to participate in studies and, in turn, result in less robust databases for researchers' use.

To acquire access, a researcher (called the "principal investigator") submits a research proposal in a "Data Access Request" ("DAR") to an NIH committee that confirms the project conforms with participant consent and other restrictions. Included with a DAR is a Data Use Certificate ("DUC") governing the principal investigator, his or her institution (here, CSU), and the NIH. The DUC outlines the researchers' and institution's obligations, including using the data "solely in connection with the research project described in the DAR"; refraining from sharing the data with "any entity or individual not covered in the submitted [DAR]"; taking certain security measures to protect access to the data; and providing the NIH committee "annual feedback on how

these data have been used and any results that have been generated as a result of access to the data, including patents and publications." R. 38-7, PageID 969, 971, 973; *see also* R. 38-11, PageID 1008–17 (2019 version of the DUC providing for substantially similar obligations). Other NIH policies, such as its Genomic Data User Code of Conduct, imposed similar obligations.

Pesta was the principal investigator for three requests relevant to this case, though he testified that he and Fuerst "co-drafted" the requests. R. 38, PageID 721. On April 12, 2018, Pesta submitted a DAR (the "First Request") to the NIH proposing that he would use the TCP study to investigate "whether there are more than trivial differences in general cognitive ability" "[b]etween [the] sexes." R. 38-7, PageID 967.

On July 15, 2018, Pesta submitted another DAR to the NIH (the "Second Request"). Given that "diagnosis rates for different mental disorders (e.g., schizophrenia, depression) vary across ethnic groups," Pesta sought access to the TCP dataset to research whether "global ancestry predicts mental health outcomes." R. 38-9, PageID 991. Put differently, Pesta sought to discern whether "evolutionary causes" more adequately explained this difference than the conventional explanation of "diagnostic bias." *Id.* He noted that he "already received access to these data" through the First Request. *Id.*

On September 11, 2018, Pesta emailed CSU officials to request a paid sabbatical for Fall 2019 to research "why are some people (and groups of people) smarter than others" by "estimat[ing] a person's ancestry" and "see[ing] if these ancestry estimates predict cognitive ability." R. 38, PageID 675–76; R. 38-4, PageID 781, 786. CSU approved the request without any indication that it took issue with the subject matter.

On September 19, 2018, shortly after making his sabbatical request, Pesta submitted yet another DAR to the NIH (the "Third Request"). In the non-technical summary section, he explained that "recent studies have constructed polygenic scores (PGS) for various traits," including "educational attainment . . . and schizophrenia." R. 38-12, PageID 1020.[1] Pesta asserted "significant concern" regarding "the transethnic validity of PGS," because low transethnic validity "potentially limits the utility of PGS for epidemiological research." *Id.* Pesta therefore proposed investigating "the effect of PGS construction on the transethnic validity of PGS for two traits; educational attainment and schizophrenia." *Id.* In a different section, Pesta characterized the relevant two traits as "educational attainment / intelligence and schizophrenia." *Id.* And he added that "[t]he study will be a correlational analysis of the statistical association between various PGSs and cognitive ability. We will conduct analyses separately in White and African American samples." *Id.* At some point, Pesta and his team sought to generate more ancestry data from the TCP dataset. At the time of the TCP study, participants self-reported race or ethnicity. To supplement the self-reported data, Pesta developed a "genetic estimate of ancestry" by uploading TCP data to a Netherlands-based server used in connection with a program called HIrisPlex-S. R. 38, PageID 688–89, 706; R. 46-3, PageID 1556–57. In violation of the DUC's admonition against transferring data to "any entity or individual not covered in the submitted [DAR]," R. 38-7, PageID 971, Pesta did not obtain approval from the NIH to upload the TCP data to the other server; he

---

[1] Defendants-Appellees' expert explained that "PGS are summary calculations made from a population's genetic information in order to improve genetic prediction/explanation of diseases and related outcomes. Different methods (i.e., algorithms) for PGS construction in different data can lead to different summary measures, and thus differences in estimated relationships between a given PGS and outcome variable, such as intelligence or disease." R. 50-1, PageID 1830 (footnote omitted).

acknowledged this was an "oversight," R. 38, PageID 706. However, he also maintained that the NIH had approved other researchers' use of the same program.

In June 2019, Pesta closed out the First Request. On August 29, 2019, he submitted a renewal of the Second Request to preserve his access to the TCP dataset. Pesta and his coauthors published *Global Ancestry* the next day, August 30, 2019, though the paper had been submitted to the publishing journal on June 8, 2019, and accepted by that journal on August 28, 2019. Pesta believed that because the paper's publication occurred after his August 29 renewal request, he did not need to report *Global Ancestry* to the NIH at that time. Pesta interpreted the DUC as requiring that researchers report only "official publications" for a renewal request, while they must report "everything" when closing out a research project. R. 38, PageID 692; *cf.* R. 38-11, PageID 1014 (DUC attached to Pesta's renewal for the Second Request providing that a principal investigator "who is seeking Renewal or Close-out of a project agree[s] to complete the appropriate online forms and provide specific information such as how the data have been used, including publications or presentations that resulted from the use of the requested dataset(s)").

Sometime in September 2019, in response to the publication of *Global Ancestry*, several researchers from institutions other than CSU (including a group referred to by the parties as "Bird et al.") submitted letters to CSU raising the possibility that Pesta engaged in research misconduct. *See* R. 38-5, PageID 796, 808. On September 19, 2019, referencing recently raised "[c]oncerns," the NIH emailed Pesta regarding his use of the TCP dataset. R. 46, PageID 1542; R. 46-1, PageID 1544–45. The NIH cited the Third Request and required that Pesta explain how his use of the TCP dataset was consistent with it. The NIH also requested information about, among other things, "[w]hat [TCP] data did [Pesta] and each of [his] collaborators . . . have access to, share, and analyze"; how Pesta and his co-authors "completed [their] data analyses using [the TCP

dataset]" and how those data "were shared"; data-access approvals for Pesta's co-authors; and Pesta's and his co-authors' non-profit status. R. 46-1, PageID 1544. The NIH required Pesta to "immediately cease all work and analyses using [the TCP dataset]" and demanded that Pesta and CSU "provide remediation plans." *Id.*

Pesta promptly responded to the NIH. He cited the Second and Third Requests and noted that "intelligence . . . is listed as a variable of interest in [the Third Request]." R. 46-2, PageID 1549. Pesta claimed that his "analysis for psychosis / schizophrenia" was in progress but "not yet complete" and stated that "it made sense . . . to finish the intelligence analysis either before or concurrently with the schizophrenia analysis." *Id.* He further asserted that he had "not yet written on 'best practices in constructing and reporting PGS,'" because his "timeline was that this would follow the psychosis / schizophrenia analysis and further data exploration." *Id.* Addressing Fuerst's access to the TCP dataset, Pesta responded that the NIH had informed Fuerst that as Pesta's research assistant, "he did not need an application." *Id.* at 1550. He concluded by explaining Lasker's and Kirkegaard's roles, their lack of access to restricted data, the entire group's affiliation with non-profit entities, and Pesta's belief that there were not "any violations of the dbGaP agreement." *Id.* at 1550–51. CSU did not take action in response to these developments, deferring instead to the NIH's investigation.

Pesta sought to renew the Third Request in December 2019. He emphasizes that CSU and the NIH approved this renewal (as well as two other requests not otherwise related to this case) notwithstanding the NIH's September 2019 letter. Pesta closed out the Second Request in August 2020 and the Third Request in February 2021.

In April 2021, Dr. Kent Taylor, a genomics researcher at another institution, submitted concerns similar to those previously raised by other academics to CSU that Pesta had engaged in research misconduct. On May 27, 2021, the NIH found that Pesta had committed several infractions. Although the NIH noted the Bird et al. group's contention that *Global Ancestry* deviated from the research projects described in all three requests, the NIH's own findings discussed only a discrepancy between the Second Request's description and a publication other than *Global Ancestry*. R. 38-5, PageID 811. This additional publication—described by the NIH as *Intelligence-associated Polygenic Scores Predict g, Independent of Ancestry, Parental Educational Levels, and Color among Hispanics in comparison to European, European-African, and African Americans* (hereinafter "*Polygenic Scores*")—was, in Pesta's words, "conceptually equivalent" to *Global Ancestry* because Pesta and his team "ran the same key analyses in each manuscript, but the former featured African American participants whereas the latter featured Hispanic American participants." *Id.* at 928. (*Polygenic Scores* appears to have ultimately been published by Fuerst, and Pesta eventually requested that Fuerst remove Pesta's name from the paper.). Citing Pesta's project close-out progress update and his disclosure of *Polygenic Scores*, the NIH noted that Pesta claimed to have "examined the relation between polygenic s[c]ores for intelligence/education . . . and general cognitive ability." *Id.* at 811. To the NIH, this research differed from that proposed in the Second Request, which had contemplated "an examination of . . . mental health outcomes, not purported conclusions about intellectual ability based on neurocognitive function." *Id.*

The NIH found a second violation arising from disclosures relating to the Second and Third Requests indicating that Pesta uploaded portions of the TCP dataset to "an unapproved online forensic DNA phenotyping service"—i.e., the HIrisPlex-S program. *Id.* at 812. The NIH cited

the DUC's prohibition of "[s]haring controlled access data with an unauthorized entity" and similar proscriptions in other NIH polices, such as the Genomic Data User Code of Conduct. *Id.* The NIH found a third violation of the DUC in Pesta's failure to report *Global Ancestry* "at the time of project renewals." *Id.*

The NIH found these violations to be "serious," expressed concern "about whether CSU staff have been properly guided and trained" regarding restricted data, and punished Pesta by revoking his access to the dbGaP and precluding him from submitting requests or being an authorized user on others' requests for three years. *Id.* It also demanded that CSU ensure the destruction of the data received by Pesta and the HIrisPlex-S program and provide information about CSU's training and remedial measures. According to Defendant-Appellee Provost Laura Bloomberg, this three-year suspension "was the most serious sanction ever meted out by the NIH against a Principal Investigator." R. 47-1, PageID 1604.

Pesta appealed this determination, and on August 17, 2021, the NIH denied his appeal. Regarding the first violation, the NIH noted that Pesta, in his "close out report for [the Second Request], . . . self-reported" that he "examined the relation between polygenic scores for intelligence/education . . . and general cognitive ability" to assess whether those scores "can help identify and understand intellectual handicaps." R. 38-5, PageID 814. The NIH again noted that this self-reported project and *Polygenic Scores* did not comport with the Second Request's research proposal, "regardless of what was proposed in other research projects." *Id.* at 815. Regarding the second violation, the NIH noted that Pesta did not dispute his conduct regarding the HIrisPlex-S program. As for the third violation, the NIH found that Pesta should have reported *Global Ancestry* in his renewal of the second request on August 29, 2019, because even though it was published the day after that renewal, it was received and accepted by the journal on June 8 and August 28,

2019, respectively. Accordingly, the NIH upheld all three violations. It also cited additional violations arising from Fuerst's apparent possession of TCP data and his refusal to destroy the data.

On June 9, 2021, after the NIH's May 2021 letter, but before the NIH's denial of Pesta's appeal in August 2021, CSU sent Pesta a "formal letter of reprimand." R. 53-2, PageID 2527, 2529–30. The letter imposed various disciplinary sanctions and requirements, including closing out the Third Request and destroying the TCP data in Pesta's and Fuerst's possession. Then, in July 2021, Defendant-Appellee Benjamin Ward, as CSU's Research Integrity Officer ("RIO"), appointed a three-person committee ("Committee")—comprising Defendants-Appellees Christopher Mallett, Conor McLennan, and Wendy Regoeczi—to investigate whether Pesta "[m]isrepresented his intended use of the dbGaP data"; "[u]sed the data to purse unethical research activity"; and "[i]mproperly allowed others to access controlled-access data"; as well as any other "additional instances of possible academic research misconduct . . . beyond the initial allegations." R. 38-5, PageID 806–07. Ward explained to the Committee that the relevant policy defined research misconduct to mean:

> fabrication, falsification, plagiarism, undisclosed conflicts of interest as defined in the policy for managing conflict of interest, or other practices that seriously deviate from those that are commonly accepted within the academic community for proposing, conducting, or reporting research. It does not include honest error or honest differences in interpretations or judgments of data.

*Id.* He further explained that to find research misconduct, the Committee must determine, by a preponderance of the evidence, that research misconduct occurred, was a "significant departure from accepted practices of the relevant research community," and was committed "intentionally, knowingly, or recklessly." *Id.* at 807. Pesta bore the burden to prove affirmative defenses, such

as "honest error," by a preponderance of the evidence. *Id.* Finally, the RIO and the Committee were obligated to conduct a diligent and unbiased investigation. *Id.*

Before his interviews with the Committee, Pesta submitted a "Statement Regarding [His] Intelligence Research," *id.* at 926; a statement about "Shifting Goalposts" and the Second Request, *id.* at 928; and an opening statement, *id.* at 820. Pesta sat for two interviews, and the Committee also interviewed several of the non-CSU complainants who raised concerns about *Global Ancestry*. The Committee sought to interview Fuerst, who declined. Pesta submitted a reply to the non-CSU complainants and a rebuttal to the Committee's draft report. Pesta asserted, before CSU officials and in court, that various deficiencies in the Committee's investigation violated the applicable regulations and suggest retaliatory motive. Those deficiencies include that: the Committee should have informally resolved the reported misconduct; the Committee improperly considered a summary of an informal conversation between CSU's lawyer and a relevant NIH official; the Committee did not permit Pesta to question witnesses; the Committee was biased against Pesta; the Committee improperly permitted Ward to edit the final report; Bloomberg partially predicated her decision on matters beyond the Committee's scope; and the Committee did not consider Pesta's adherence to his subject matter.

Additionally, regarding the substance of the investigation, across his submissions and interviews, Pesta maintained several general themes. He asserted that to the extent he engaged in improper conduct, he did not do so intentionally, knowingly, or recklessly, and thus lacked the mens rea required to establish research misconduct. And to the extent that the CSU Committee relied on the NIH's findings, he maintained that although his research may have ultimately addressed different issues than those stated in the Second Request, his research focus changed over time, and he believed the Third Request adequately clarified his new topic. Finally, he argued that

the Committee and complainants like Taylor and the Bird et al. group were acting to silence what was, in their view, racist research, rather than acting in response to genuine research misconduct.

Nonetheless, the Committee, in its final report, found clear and convincing evidence of four instances of research misconduct:

1. Unauthorized use of National Institutes of Health controlled-access data from the database of Genotypes and Phenotypes;

2. Publishing research findings despite NIH explicitly stating that Dr. Pesta and his colleagues did not have approval to do so;

3. Failure to receive IRB approval for use of NIH data that went beyond what was outlined in a Data Use Certification Agreement; and

4. Unauthorized research funding for Cleveland State University research efforts without CSU approval (e.g., by College Dean or Sponsored Programs and Research Services).

*Id.* at 803 (cleaned up).

The Committee also identified "[o]ngoing concerns" that were "beyond the scope of the Committee but may need further review": specifically, ethics concerns regarding the funding from the Human Phenome Diversity Foundation and potential data misuse by Fuerst and Kirkegaard in other cases, as well as Pesta's role in supporting such misuse or implying an affiliation of Kirkegaard with CSU. *Id.* at 802–03.

The Committee concluded:

> [T]he ongoing use of outside funding through the Human Phenome Diversity Foundation, opaque fundraising for this Foundation, lack of clarity around where dbGaP data were - or may still be - stored (and discrepancies between what was indicated in the data access request and reported to CSU - and where the data ended up being stored), and other potential related problems raise concerns and contribute to an overall pattern of concerning behavior when reviewed objectively by the Committee members. Clearly, the facts are that Dr. Pesta's last five years of research and scholarship have led to serious problems and potential consequences - NIH suspension of data access for three years and denial of any further

appeals, and this ongoing CSU Office of Research internal investigation.

*Id.* at 803.

Defendant-Appellee Provost Bloomberg determined that Pesta's conduct warranted dismissal and explained her reasoning in a January 2022 letter. She reviewed the NIH's findings and the CSU Committee's findings and concurred with the latter's conclusions. Bloomberg acknowledged Pesta's position that "the inquiry violate[d] [his] academic freedom" but found instead that the inquiry focused on, and found, violations of "ethical conduct expectations and the standard procedures of research." *Id.* at 959. Bloomberg also emphasized Pesta's use of a personal computer to analyze the TCP dataset—despite representing to CSU that Pesta would use his CSU-issued laptop—and his role in Fuerst gaining access to the dataset and "go[ing] a little bit rogue." *Id.* at 960–61 (quoting Pesta's testimony before the Committee). And she condemned Pesta's insistence that co-managing the Human Phenome Diversity Foundation without disclosing that relationship to CSU did not raise conflict-of-interest concerns. Given these violations, Bloomberg concluded that of the six grounds for termination provided by the relevant collective-bargaining agreement, Pesta satisfied four: "(1) incompetence or dishonesty in teaching or scholarship; (2) neglect of duty; (3) personal conduct which substantially impairs the individual's fulfillment of his/her institutional responsibilities; [and] (4) interfering with the normal operations of the University." *Id.* at 962–63. Bloomberg further determined that the "seriousness of this research misconduct case and the fact that the harm extend[ed] beyond [Pesta's] personal reputation to taint the reputation of CSU as a whole . . . warrant[ed] the most serious sanction be administered and that any lesser sanction would be disproportionate to the gravity of [his] conduct." *Id.* Accordingly, Bloomberg invoked the union-negotiated termination process of convening an ad-

hoc committee, comprising union and CSU officials, to advise her whether it agreed that termination was warranted.

In February 2022, after the ad-hoc committee heard from Pesta and Bloomberg, reviewed the CSU Committee's final report and supporting documentation, and received written rebuttals from Pesta, it agreed with Bloomberg unanimously and noted that it reached that conclusion "irrespective of the content of Dr. Pesta's research." R. 38-23, PageID 1105–06. Specifically, the ad-hoc committee found that the CSU Committee's first two asserted violations—i.e., the unauthorized use of the TCP dataset and publishing without NIH approval—"have the potential to seriously impact future interactions between NIH and CSU and . . . directly conflict with" Pesta's "responsibility to scholarship and to the institution." *Id.* at 1106 (emphasis removed). Regarding the third and fourth asserted violations—i.e., failure to receive IRB approval and use of unauthorized research funding from the Human Phenome Diversity Foundation—the ad-hoc committee noted Pesta's "differences in opinion[]" but upheld Bloomberg's determination that Pesta "violat[ed] the most basic ethical guidelines governing research involving human subjects" and acted "incongruent with [his] responsibility to the institution" by using the Foundation's funds to "execute research and [produce] publication(s) that at some point included Dr. Pesta and his affiliation with CSU." *Id.* The ad-hoc committee therefore found that "a decision to dismiss Dr. Bryan Pesta is warranted based on more than one of the 6 instances" enumerated by the collective-bargaining agreement. *Id.* at 1107.

In late February, Bloomberg followed the ad-hoc committee's unanimous recommendation and terminated Pesta's employment. *Id.* at 1108. Pesta's union decided that it would be unsuccessful if it attempted to arbitrate this determination because of "the level of due process that Dr. Pesta had throughout the process, his failure to rebut the charges, the seriousness of the charges,

and the overwhelming evidence against him." R. 38-26, PageID 1139–40. Union officials also "looked to see if there were any procedural violations which might be grievable and found none." *Id.* at 1140. Pesta alleged that Defendant-Appellee Harlan Sands, as CSU president, was aware of and either acquiesced or countenanced the foregoing investigation and termination.

## II. Procedural History

After the district court resolved several motions regarding Pesta's pleadings—orders not challenged on appeal—the following claims remained: A First Amendment retaliation claim against each of the individual Defendants-Appellees (in their individual capacities) for the investigation of Pesta's research misconduct; a First Amendment retaliation claim against the same Defendants-Appellees based on the termination of Pesta's position with CSU; and a claim for declaratory and injunctive relief against Bloomberg (in her official capacity) that would restore Pesta's employment and address academic freedom for the study of race, genetics, and intelligence.[2] Pursuant to 42 U.S.C. §§ 1983 and 1988, Pesta sought damages for the first two counts and attorneys' fees for all three counts.

Following dueling motions for summary judgment, the district court ruled in favor of Defendants-Appellees. Regarding both First Amendment-retaliation claims, the court held that "Pesta was fired because of his own misconduct associated with accessing restricted data from the NIH," not because of "the content of his Global Ancestry paper." R. 73, PageID 3973. Alternatively, the court explained that "even if CSU *had* fired him for publishing the Global Ancestry paper, it most likely still would not have run afoul of the First Amendment" because "[w]hen public employees make statements pursuant to their official duties, the employees are not

---

[2] Although the case caption includes CSU and its Board of Trustees, the district court dismissed these parties in orders not challenged on appeal.

speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).  Regarding declaratory and injunctive relief, the district court held that Pesta's requested remedy—in short, requiring Bloomberg to recognize the "hereditarian hypothesis" as "worthy of study" and its researchers as "entitled to academic freedom"—sought only advisory opinions from the court.  *Id.* at 3975.  Accordingly, the court entered summary judgment in Defendants-Appellees' favor, and this appeal followed.

### III.  Analysis

We review a grant of summary judgment de novo.  *Levine v. DeJoy*, 64 F.4th 789, 796 (6th Cir. 2023).  "Summary judgment is appropriate where the evidence presents no genuine dispute of material fact such that the moving party is entitled to a judgment as a matter of law." *Gammons v. Adroit Med. Sys., Inc.*, 91 F.4th 820, 825 (6th Cir. 2024) (citing Fed. R. Civ. P. 56(a)).  In reviewing a grant of summary judgment, we must view the evidence in a light most favorable to and draw all reasonable inferences in favor of the non-moving party.  *Id.* at 825.  We "may affirm on any grounds supported by the record, even if they are different from the grounds the district court relied upon in reaching its summary judgment decision below." *Id.* (citing *City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994)).

To establish First Amendment retaliation, a plaintiff must prove:

> (1) that there was constitutionally-protected conduct; (2) an adverse action by defendants sufficient to deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection between the first and second elements—that is, the adverse action was motivated at least in part by plaintiff's protected conduct.

*Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 207 (6th Cir. 2010) (citing *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir. 2000)).  The parties do not dispute that the second element is

met. They disagree, however, regarding the appropriate legal standard for the first. And Pesta's claims of error regarding the district court's review of the evidence are relevant to the third element—his contention that Defendants-Appellees investigated him and terminated his position for publishing *Global Ancestry* rather than for any research misconduct.

**A.**

A plaintiff alleging First Amendment retaliation establishes causation "by offering direct or circumstantial evidence indicating that the protected conduct was a substantial or motivating factor behind the adverse action against [the] plaintiff." *Eckerman*, 636 F.3d at 208 (citing *Kreuzer v. Brown*, 128 F.3d 359, 363 (6th Cir. 1997)). This court recently clarified that notwithstanding statements to the contrary in several of our cases, the "motivating-factor test . . . does not require a but-for relationship" because "speech sometimes may motivate a defendant's harmful action even if the defendant would have taken the same action for another reason without the speech." *Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 309 (6th Cir. 2023). Instead, "[i]f the plaintiff meets this lower causation standard, the burden shifts to the . . . defendants" to "prov[e] that they would have taken the same action even if the plaintiff had not spoken." *Id.* When a defendant moves for summary judgment in this burden-shifting context, the defendant must at first "only show that the record lacks evidence from which 'a rational trier of fact' could find for the plaintiff" regarding the motivating-factor issue. *Id.* (quotation omitted). But if the defendant cannot make this showing and, in turn, the burden shifts to the defendant to negate but-for causation, it "must affirmatively introduce evidence of such weight that no rational jury could disagree with it." *Id.* at 310.

Pesta has not provided any typical evidence of causation, such as that CSU treated similarly situated professors differently or that the adverse action occurred "very close in time after [his] employer learned of protected activity." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Instead, he devotes significant briefing to perceived bias by the CSU Committee and Bloomberg, as demonstrated, in Pesta's view, by certain statements and procedural defects in the investigation. Pesta alleges that the Committee was biased against him, despite that the rules state "fact-finding" and "adjudication" must be "impartial" and "fair." Ohio Admin. Code 3344-28-01(A), -05(B) (committee members must be "unbiased"). Pesta points to the fact that, while drafting the Committee's report, one Committee member, Regoeczi emailed McLennan and Mallett to express her concern that the Committee had "not used strong enough language" when expressing that "the subject matter of [Pesta's] research is unethical." R. 57-1, PageID 3294–95. She pushed for stronger language condemning Pesta's research as unethical and proposed quoting an American Psychological Association guideline "to more directly address the point about the harm done by his research (without stating it as our own opinion)." *Id.* at 3295. But McLennan testified that although the Committee considered condemning Pesta's conclusions, it refrained "[b]ecause [it] didn't think it was directly relevant to the task at hand[] . . . and ultimately [its] findings of academic research misconduct." R. 54, PageID 2619. This view apparently carried the day because the Committee declined to include much of the language at issue in its final report, and the Committee expressly *disclaimed* that it considered the content of Pesta's work.

Pesta points to Mallett's testimony as evidence that the Committee did not proceed impartially and fairly. However, consideration of the full context of the exchange renders the testimony innocuous. Regarding proposed language in a draft of the final report that condemned Pesta's research as harmful, Mallett testified:

Q. Do you think if your co-defendants on the committee thought that Pesta had done harm by his research they were proceeding against him impartially and fairly?

A. Could you repeat that?

Q. Do you think that if your co-defendants on the committee thought that Pesta had done harm by his research that you were proceeding against him impartially and fairly?

A. No. When you investigate --

Q. Respectfully, sir, it's a yes or no question.

A. No. Then the answer is no.

R. 57, PageID 3107–08. Moments later, Mallett asserted that the Committee "clearly came to the conclusion" that finding Pesta's research harmful "was not part of the charge" because the Committee ultimately omitted much of the language at issue from the final report. *Id.* at 3110. When Pesta's counsel claimed the omission occurred because the draft language "showed a bias," Mallett said, "That was incorrect. No, I did not say that." *Id.* Finally, when asked whether "labeling Dr. Pesta's research as harmful provides a moral justification for suppressing it," Mallett replied, "No, because the prior wasn't done." *Id.* at 3113. The full exchange therefore demonstrates that Mallett may have misunderstood the question and, in any event, that he testified clearly that the Committee had not determined Pesta's research was harmful and deserving of suppression because it "was not part of [its] charge." It is worth noting as well that, unlike in Pesta's three requests to the NIH, in his request for a sabbatical, he clearly described the nature of the research that would lead to *Global Ancestry*, and CSU officials raised no concerns about the subject matter at that time.

The array of procedural defects alleged by Pesta are likewise neutralized by a complete review of the record. First, Pesta maintains that the Committee failed to resolve the reported misconduct informally before proceeding to an investigation and failed to conduct that

investigation expeditiously. The relevant rules state that "the [RIO] shall immediately assess [misconduct allegations] to determine whether there is sufficient evidence to warrant an inquiry" and "will attempt to resolve, on an informal and confidential basis, any reported misconduct," Ohio Admin. Code 3344-28-03(C), -03(D), -04(C) (1997). Although Ward did not attempt to resolve the allegations against Pesta informally before escalating his review to an investigation, Ward testified to his belief that, notwithstanding CSU's misconduct policy, federal regulations precluded CSU officials from informally resolving an NIH matter. Ward therefore read the CSU misconduct policy's requirement to "resolve" misconduct allegations as, instead, a requirement to "review[] the allegation and determine[e] whether it [was] made in good faith." R. 56 PageID 2873.

Second, Pesta claims that the Committee considered only a summary of an informal, un-recorded conversation between a CSU lawyer and the NIH official who signed the May 2021 letter. The rules provide that "[w]henever possible, interviews should be conducted of all individuals involved . . . in making the allegation," and "[a]ll interviews should be tape-recorded." Ohio Admin. Code 3344-28-06(H). It is not clear what impact, if any, the Committee's consideration of the informal conversation had on the final report, and Ward explained that he did not think that the NIH official was subject to the misconduct policy's rules because he merely signed the May 2021 letter "on behalf of his office" and was not an individual asserting an allegation against Pesta. R. 56, PageID 2938.

Third, Pesta asserts that the Committee did not permit him to question witnesses. The misconduct policy provides that "the respondent may write out questions to be asked of witnesses during an inquiry and/or investigation, hear the answer(s), and submit for response any follow-up questions." Ohio Admin. Code 3344-28-03(K), -06(I) (providing a timeframe accounting for the

accused's "opportunity to confront and question all witnesses"). Ward testified regarding his belief that this rule does not require face-to-face confrontation or cross-examination and that Pesta was allowed to respond to interviewees and submit questions to them. Ward did not know whether the Committee actually forwarded Pesta's questions to the interviewees, however. Mallett testified that he did not know whether Pesta's questions were distributed to interviewees and that Ward would have been responsible for ensuring that they were. And McLennan stated that Pesta was not permitted cross-examination and his questions were *not* given to the interviewees. The Committee's apparent failure to transmit Pesta's questions to Taylor and the Bird et al. group is concerning. But McLennan explained that the Committee ultimately determined that the interviewees did not have "any firsthand knowledge that was relevant to the scope of [its] investigation," and Pesta submitted responses to their statements. R. 54, PageID 2661–63.

Pesta further claims that the Committee improperly permitted Ward to edit the final report. The provisions cited by Pesta provide that the RIO "will have primary responsibility for adherence to the[se] procedural requirements" and "will assist" Committee members with compliance therewith. Ohio Admin. Code 3344-28-03(B), -03(E). But Ward's edits to the Committee's report, which Pesta attempts to paint as nefarious intervention to ensure the outcome, ultimately amounted to providing "historical pieces and all of the addendum pieces that were not part of the direct decisions and conclusions made by the committee." R. 63, PageID 3636. An email chain also indicates that Ward's proposed edits reiterated and added "direct references to the [applicable] evidentiary standard of the policy." R. 63-2, PageID 3802–03.

Similarly, Pesta faults Bloomberg for predicating her decision in part on matters beyond the Committee's findings, despite that "the deciding official shall determine whether misconduct has occurred" "[b]ased on the findings presented in the final investigation report." Ohio Admin.

Code 3344-28-06(K)(5). In particular, Pesta reproaches Bloomberg for being too specific by citing a conflict-of-interest rule regarding payments of more than $5,000, whereas the Committee's report did not expressly reference CSU's conflict-of-interest policy and stated generally that a researcher of Pesta's experience should have known to disclose third-party reimbursements.

Finally, Pesta emphasizes that CSU's misconduct policy asserts "[t]he primary responsibility of the faculty is to their subject and to seeking and stating the truth." Ohio Admin. Code 3344-28-01(A). A letter from the provost's office raised the possibility that Pesta misrepresented his findings, R. 63-3, PageID 3807, yet the Committee ultimately never reviewed the substantive conclusions of *Global Ancestry* for their validity—indeed, it expressly *disclaimed* that it considered the content of Pesta's work, R. 38-5, PageID 799. Pesta questions why the Committee never assessed his adherence to his "primary responsibility," but regardless, CSU's misconduct policy also requires faculty to "maintain the highest standards of professional ethics" and "pledge quality and integrity in their research and publications . . . through dependence on accepted disciplinary professional standards." Ohio Admin. Code 3344-28-01(A). The misconduct policy acknowledges that "[p]articular circumstances in an individual case may dictate variation from normal procedure deemed in the best interests of [CSU]," though any "[s]uch variations from normal procedure should be constructed to ensure fair treatment to the subject of the inquiry or investigation." *Id.* -01(C).

Pesta has indeed identified one or two procedural shortcomings. But when viewed as a whole, "the record lacks evidence from which 'a rational trier of fact' could find," either from direct evidence of bias or implied bias from a procedurally defective investigation, that the content of *Global Ancestry* was a motivating factor for Pesta's investigation and termination. *Lemaster*, 65 F.4th at 309 (quotation omitted); *cf. McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855,

863 (8th Cir. 2009) (discounting claim that "investigators did not follow [university] policy to interview all of the witnesses" because "[t]he appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination"); *Crosbie v. Highmark Inc.*, 47 F.4th 140, 145 (3d Cir. 2022) (a "slopp[y]" investigation that "did not follow standard procedure . . . is not enough.  The question is not whether [the defendant] conducted the 'best, or even a sound' inquiry, but whether the investigation was a sham, a mere pretext to retaliate." (quoting *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997))).

We therefore conclude that the district court properly determined that Defendants-Appellees established "that the record lacks evidence from which 'a rational trier of fact' could find for the plaintiff" regarding the motivating-factor issue.  *Lemaster*, 65 F.4th at 309 (quotation omitted).

**B.**

Further, if we accept that Pesta cleared the motivating-factor hurdle, "no rational jury could disagree" that Defendants-Appellees "would have taken the same action even if" the content of *Global Ancestry* had been different.  *Id.* at 309–10.  The NIH found that Pesta committed four violations when he (1) researched and published (through *Polygenic Scores*) on issues not disclosed in the Second Request; (2) uploaded TCP data to the HIrisPlex-S program; (3) failed to disclose *Global Ancestry* in renewal requests; and (4) as the principal investigator, failed to ensure Fuerst's compliance with the DUC.  The NIH imposed monumentally severe sanctions on Pesta, obligated CSU to ensure the destruction of TCP data, and asked CSU to explain its data-security measures and any changes CSU would make following this incident.  The CSU Committee found that Pesta committed four instances of research misconduct when he (1)(a) researched and

published (through *Global Ancestry*) on issues not disclosed in the Second Request; (1)(b) uploaded TCP data to the HIrisPlex-S program; (2) published a paper that used dbGaP data without the NIH's permission; (3) failed to receive IRB approval from CSU for using TCP data—including data about minors—in a manner inconsistent with the DUC; and (4) failed to disclose the reimbursements he and Fuerst received from the non-profit they ran.

Regarding the first violation, the committee cited the discrepancy between the proposed research of the Second Request and the findings in *Global Ancestry*. It also found that Pesta's use of the HIrisPlex-S program, for which Pesta accepted responsibility in his interviews with the Committee, violated the DUC for the Second and Third Requests, "seriously deviate[d] from common research practices and was done knowingly." R. 38-5, PageID at 800. Regarding the second violation, the Committee found that a publication with Pesta listed as a co-author[3] was a knowing deviation from norms because the NIH denied Fuerst permission to publish it in February 2020 and did not approve his subsequent requests to publish, yet Fuerst eventually did so anyway in September 2020. The Committee noted Pesta's testimony that Fuerst would not have put Pesta's name on the paper without Pesta's knowledge, and the Committee interpreted Pesta's subsequent request to remove his name as an indication that Pesta understood the publication to be wrongful. In his rebuttal of the Committee's final report, Pesta claimed that when the NIH admonished Fuerst that he "can NOT use that particular data set for [his] research," the NIH was not clear regarding whether Fuerst could publish already-completed manuscripts. *Id.* at 951. After NIH did not respond to follow-up requests from Fuerst, he took that to mean he had permission.

---

[3] The final report refers to a paper titled *Genetics, ancestry, and intelligence among East Coast Hispanic and European Americans*; although published around the same time as *Polygenic Scores* and appearing to discuss similar issues, this paper appears to be a different document than *Polygenic Scores*.

Addressing the third violation requires an understanding of an Institutional Review Board ("IRB"). According to Pesta, an IRB "is concerned with the protection of 'human subjects' research," as defined by federal regulations. R. 64-1, PageID 3851–52 (citing 45 C.F.R. § 46.102(e)(1)). Crucially, in Pesta's view, the relevant regulations' definition of "human subject[]" contemplates a researcher gathering data from the subject through direct intervention or interaction, 45 C.F.R. § 46.102(e)—not a researcher who, like Pesta, assesses data *without* interacting with human subjects. Pesta also notes an email from Ward indicating that CSU did not give Pesta IRB approval because NIH policy did not require it. But, contrary to Pesta's contention, the Committee found IRB approval necessary because Pesta was using sensitive data outside of the governing regulations and protocols, not because his research involved human subjects.

Finally, regarding the fourth violation, the Committee faulted Pesta for using funds from the Human Phenome Diversity Foundation, a non-profit that Pesta started with Fuerst, to purchase a computer and reimburse certain of Fuerst's expenses. The Committee held that "using funding from a personal 501(c)(3)" to "publish[] with [Pesta's] CSU affiliation[] without CSU's permission or knowledge seriously deviates from accepted practices." R. 38-5, PageID 802.

Bloomberg agreed with the CSU Committee's findings; noted the severity of the NIH's sanctions and the resulting negative impact on CSU as a research institution; found that the investigation addressed Pesta's "violating ethical conduct expectations and the standard procedures of research," not his "academic freedom"; and concluded that Pesta's conduct implicated four of the six grounds for termination under the applicable collective-bargaining agreement. *Id.* at 959. Pesta's own union (1) participated in an ad-hoc committee that ultimately supported his termination, and (2) determined arbitration would be unsuccessful given the thoroughness of CSU's investigation.

Pesta does not dispute that as a research university, CSU was concerned about its relationship with the NIH. Although Pesta argues that the NIH's investigation was erroneous, the NIH is not a party to this case and therefore is not accused of violating Pesta's First Amendment rights. At most, then, the inadequacy of the NIH's findings could support Pesta's claims against Defendants-Appellees only to the extent that the findings were so deficient or pretextual that they suggest CSU was, in turn, operating on pretext in partially relying on them. Pesta does not meaningfully undermine the NIH's findings, however. Regarding the incongruity between his Second Request and the subject of his research, Pesta faults the NIH for punishing research that, in Pesta's view, was consistent with the Third Request regardless of its fidelity to the Second. But even the Third Request failed to notify the NIH that Pesta would research intelligence, race, and genetics. As Defendants-Appellees' expert explained, Pesta's reference in the Third Request to "correlational analysis" refers to "estimate[s] [in] the relationship between two or more variable/measures" but, "[u]nlike regression analysis," does not purport to establish a causal relationship between the variables. R. 50-1, Page ID 1830–31. Therefore, *Global Ancestry*'s effort to "explain differences in intelligence[] . . . by racial ancestry" deviated from the Third Request because although both discussed race and intelligence, the Third Request proposed a "methodological inquiry" that would "evaluat[e] different PGS construction methods in correlational analyses," whereas *Global Ancestry* rendered "substantive inference from regression estimates" regarding "differences in intelligence by race or racial ancestry." *Id.* at 1831–33.[4]

---

[4] Pesta describes Defendants-Appellees' expert report as a "sham" without explaining on appeal what makes it defective, beyond that it failed to address two deposition excerpts. Appellant's Br. 41–42. In any event, we need not rely on the report's conclusions to find that Defendants-Appellees have established a non-retaliatory motive.

Specifically, Pesta proposed a methodological inquiry evaluating PGS-construction methods correlatively, but his eventual research offered causal conclusions about racial differences in intelligence derived from regression estimates. Indeed, after the publication of *Global Ancestry* and in response to the NIH's first letter in September 2019, Pesta himself acknowledged that he had not yet written on best practices for PGS construction—i.e., the very topic of the Third Request.

Further, Pesta claims that his use of the HIrisPlex-S program was a mere "technical infraction"—a claim he makes without reference to legal authority or even other incidents in which researchers acted similarly but received less punishment. He argues that no other CSU official was punished for Pesta's use of the HIrisPlex-S program but fails to establish that any such person even knew that he planned to use the program in this manner. At most, CSU officials were negligent when, despite learning from the Bird et al. group's September 2019 letter that Pesta may have improperly uploaded TCP data to a "foreign website," they subsequently certified Pesta's compliance with NIH rules in connection with project renewals and requests in late 2019 and 2020. R. 38-5, Page ID 808. Pesta likewise does not meaningfully refute his responsibility, as the principal investigator, for Fuerst's access to the TCP dataset and his subsequent refusal to destroy whatever data he retained. Nor does he address on appeal his failure to disclose *Global Ancestry*.

Accordingly, Pesta has not shown that the NIH's findings were so deficient that CSU must have acted pretextually in partially relying on them. And review of the record indicates that even setting aside the NIH's findings, CSU's investigation was not pretextual either. Whatever the controversial nature of *Global Ancestry*, CSU officials were reasonably alarmed by Pesta's cavalier handling of sensitive genomic data, misleading representations to the NIH about the nature of his research, failure to observe basic conflict-of-interest reporting, and the impact that his

actions had on CSU as a research institution reliant on the NIH. Pesta's arguments that CSU has not established these non-retaliatory bases for investigation and termination fall flat, even considering that he does not bear the burden to refute CSU's evidence. *See Good v. Walworth*, No. 21-1429, 2023 WL 9320823, at *4 (6th Cir. Aug. 22, 2023) ("[T]he burden does not shift back to a plaintiff to establish pretext in a First Amendment retaliation case once the plaintiff has established that the protected activity was a motivating factor for the adverse action. Rather, the defendants must prove they would have taken the same action anyway." (citation omitted)), *cert. denied*, 144 S. Ct. 1071 (2024).

As with the NIH's findings, Pesta does not meaningfully dispel the CSU Committee's finding that his research diverged from the Second Request—even if we consider the research project proposed in the Third Request. Nor does Ward's testimony change this analysis. Pesta faults the district court for ignoring Ward's testimony about notifying the NIH of a "different use of the data" than what a researcher previously identified. R. 56, PageID 2990. Ward agreed that the DUC provided "[n]ew uses of these data outside those described in the DAR will require submission of a new DAR," and Ward stated, "So then under the third request, I guess under the new DAR, he could conduct that research then." *Id.* at 2990–91. This statement, of course, does not establish that Pesta's research *actually* comported with the Second or Third Request. At most, it suggests that Ward—who, as the RIO, was not tasked with telling the Committee what result it should reach—may not have found one of the violations cited by the Committee to be entirely convincing.

Like the NIH, the CSU Committee faulted Pesta for his use of the HIrisPlex-S program, and his response to this charge fails for the same reasons discussed above—he acknowledges he failed to obtain approval, and he cites no legal authority or similar disciplinary cases supporting

his claim that uploading thousands of individuals' genomic data to a third-party program was merely a "technical infraction." Regarding publishing findings without the NIH's approval, Pesta claims that he did not actually publish the paper in question, despite his concession that Fuerst would not have put Pesta's name on the paper without Pesta's knowledge, and despite that Fuerst never received approval to publish from the NIH after it told him, in no uncertain terms, that he could not use the TCP dataset for his research. Further, when Pesta argues that his research did not require IRB approval because it did not directly concern "human subjects," Appellant's Br. 12–13, he misunderstands the CSU Committee's stated reason for the necessity of IRB review: Although IRB approval was unnecessary for TCP data used in accordance with an approved DAR, at least part of Pesta's research involved using TCP data *inconsistently* with his approved DARs. In fact, the Committee noted that although the NIH does not require approval by a university's IRB for "sharing of dbGaP data [(such as the TCP dataset)] through a DUC agreement," CSU IRB approval *is* required for use of dbGaP data that falls *outside of* the governing DUC and data use policies (such as uploading TCP data to the HIrisPlex-S program) because such conduct "posed potential risk of harm," especially considering that the TCP participants included minors. R. 38-5, PageID 801.

And Pesta does not address the fact that his conduct appears to have caused the NIH to doubt CSU as a whole given that the NIH tasked CSU with proposing both remedial efforts and prophylactic changes. Finally, Pesta may be right that CSU's conflict-of-interest policy lacks clarity regarding reimbursement from non-profits. Indeed, Mallett, one of the Committee members, testified that although the "normal procedure" for an "academic employed by CSU [who] raise[d] funds outside the university through an LLC" would be to disclose it, the Committee did not expressly reference CSU's conflict-of-interest policy. R. 57, PageID 3131–32. And

Bloomberg likewise asserted that disclosure would have been "[c]ommon research practice" but acknowledged the Committee did not refer to the policy. R. 53, PageID 2328, 2330. However, as the Committee noted, the prudence of submitting such compensation for review should not escape a seasoned researcher. Perhaps if this were Pesta's only infraction, a reasonable juror might question the veracity of this reason for Pesta's investigation and termination. But considering *all* of the foregoing, no reasonable juror would do so.

Nor does Pesta address the conclusions of the ad-hoc committee—comprising in part members of his own union—that the CSU Committee and Bloomberg acted "irrespective of the content of Dr. Pesta's research," and that Bloomberg's decision to terminate Pesta was warranted. R. 38-23, PageID 1106–07. Pesta's union also determined arbitration would not be successful because of the soundness of CSU's investigation.

For the foregoing reasons, we affirm the district court's determinations that Pesta failed to establish causation and, in turn, that Defendants-Appellees are entitled to summary judgment in their favor.[5]

## IV. Conclusion

For the reasons set out above, we **AFFIRM** the district court's entry of summary judgment in favor of Defendants-Appellees. [6]

---

[5] Regarding Pesta's declaratory- and injunctive-relief claim, Pesta briefly argues that "if either of the first two []counts [i.e., the First Amendment claims] stand[s], so should the declaratory relief." Appellant's Br. 54. Because we affirm the entry of summary judgment on both of Pesta's First Amendment retaliation claims, his declaratory- and injunctive-relief count necessarily fails as well.

[6] Given this holding, we do not address the parties' arguments about qualified immunity. And because we reach this conclusion without relying on the damaging after-acquired evidence that Pesta argues the district court improperly considered, we likewise do not reach that claim of error.